UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN W. BROCKLESBY,
        Plaintiff,


                v.                          CIVIL ACTION NO.
                                            20-10113-IT


KILOLO KIJAKAZI, Acting
Commissioner of the Social
Security Administration,
        Defendant.[1]


**REPORT AND RECOMMENDATION RE:**
**PLAINTIFF'S MOTION TO REVERSE AND REMAND TO THE**
**SOCIAL SECURITY ADMINISTRATION (DOCKET ENTRY # 15);**
**DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION**
**(DOCKET ENTRY # 17)**

**October 25, 2021**


**BOWLER, U.S.M.J.**

    Pending before this court are cross motions by the parties,

plaintiff John W. Brocklesby ("plaintiff") and defendant Kilolo

Kijakazi ("Commissioner"), acting commissioner of the Social

Security Administration.  Plaintiff seeks to reverse and remand

the decision of the Commissioner (Docket Entry # 15) whereas the

---

[1]  This court takes judicial notice that Kilolo Kijakazi, acting
commissioner of the Social Security Administration, replaced
Andrew M. Saul, the prior commissioner of the Social Security
Administration.  Kilolo Kijakazi is therefore substituted for
Andrew M. Saul as the defendant in this action.  See Fed. R.
Civ. P. 25(d).

Commissioner moves for an order to affirm the decision (Docket
Entry # 17).

PROCEDURAL HISTORY

On February 2, 2018, plaintiff completed an application for
disability insurance benefits ("SSDI") (Tr. 212-13).[2]  Plaintiff
also applied for supplemental security income ("SSI").  (Tr.
214-22).  Both applications allege a disability rendering
plaintiff unable to work as of June 26, 2017.  (Tr. 212, 214).
The Social Security Administration ("SSA") denied both claims
initially and on reconsideration.  (Tr. 149, 152, 160, 163).

Plaintiff requested a hearing before an Administrative Law
Judge ("ALJ"), who conducted a hearing on August 6, 2019.  (Tr.
63-89, 166-67).  Plaintiff and a vocational expert ("VE")
testified at the hearing.  (Tr. 63-89).  In a decision on
September 3, 2019, the ALJ concluded plaintiff was not disabled.
(Tr. 33-56).

After an unsuccessful appeal, plaintiff filed this action
seeking a reversal of the Commissioner's final decision or,
alternatively, a remand pursuant to 42 U.S.C. §§ 405(g) and
1383(c)(3).  (Docket Entry # 1).  After conducting a hearing on
the motion to affirm and the motion to reverse or remand, this

---

[2]  "Tr." refers to the page number in the lower right corner of
the administrative record.  (Docket Entry # 12).

2

court took the motions (Docket Entry ## 15, 17) under advisement.

FACTUAL BACKGROUND

I.   Plaintiff's Age, Education, and Work History

Plaintiff, born on February 9, 1973, was 45 years old on the date of his application for SSDI, and 46 years old on the date of his application for SSI.  (Tr. 72-73, 212, 214).  He has a high school diploma and completed two years of community college without obtaining a degree.  (Tr. 73).  He was homeless at the time of the ALJ hearing and has relevant work experience in the hardware sales department of Home Depot, operations management at Jiffy Lube, maintenance at Seasons Market, loss prevention at Best Buy, and assembly at Toys "R" Us.  (Tr. 72-74).  Plaintiff alleged an inability to work because of various physical and psychological conditions.  (Tr. 74-84, 214).

II.   Plaintiff's Medical History

A.   Physical Conditions

1.   Sjögren's Syndrome and Related Conditions

In November 2016, plaintiff underwent testing for Sjögren's syndrome, rheumatoid arthritis, and other conditions.  (Tr. 408, 629-35).  On May 8, 2017, plaintiff had an initial rheumatology consult with Rachel L. Gross, M.D. ("Dr. Gross") at PMG Physicians Associates ("PMG Associates") in Plymouth, Massachusetts due to positive antibody tests.  (Tr. 464-68).

Dr. Gross took note of plaintiff's: chronic joint pain in his
knees and shoulders; difficulty getting up from sitting;
worsening of the pain in the cold; lack of swelling in his
knees; dry mouth; dry eyes; past diagnosis of chronic
obstructive pulmonary disease ("COPD"); fingers turning white
and blue in the cold; and eczema.  (Tr. 465).  Plaintiff
informed Dr. Gross that taking ibuprofen alleviates his pain.
(Tr. 44, 465).  She explained the issues associated with
Sjögren's syndrome and manifestations of the condition.  (Tr.
464).  She also noted plaintiff's history of celiac disease and
recommended a gluten-free diet.  (Tr. 464-65).  On examination,
Dr. Gross documented a "normal range of motion and strength in
all joints" and a normal gait.  (Tr. 44, 467).  Her office notes
reflect a body mass index ("BMI") of 17.61 and a weight of 133
pounds.[3]  (Tr. 466).

After being hospitalized at Beth Israel Deaconess in
Plymouth, Massachusetts on June 24, 2017, for fever, rash,
nausea, vomiting, acute renal failure, lethargy, "tea colored
urine," and sneezing, plaintiff was diagnosed with and treated
for: right lower lobe pneumonia; hand, foot, and mouth disease;
nephrotic syndrome; acute renal failure; and membranous

---

[3]   At the ALJ hearing, plaintiff testified he was six feet and
two inches tall (Tr. 79), which the record supports (Tr. 514).
The ALJ determined that plaintiff is six feet, two inches tall
(Tr. 43), which this court accepts.

glomerulonephritis.  (Tr. 403, 405, 408-09, 429).  Testing
showed abnormalities in kidney and liver function, including a
kidney biopsy with the diagnosis of membranous
glomerulonephritis in a pathology report.  (Tr. 396, 401-406).
A June 24, 2017 chest X-ray revealed a "small pleural effusion"
at the base of the right lung associated with "basilar airspace
disease," as noted by the ALJ.  (Tr. 50, 402, 981).  A discharge
summary reflects plaintiff's diagnosis of mononucleosis two days
prior to his admission.  (Tr. 408).  It also recites that
plaintiff "understands the plan of care to follow up closely
with . . . Dr. [Panagiotis] Vlagopoulous of nephrology" and call
his office for an appointment.  (Tr. 410, 416).  The symptoms of
fever and acute renal failure resolved prior to plaintiff's
discharge, and the rash was in the process of resolving at the
time of discharge on or about July 3, 2017.  (Tr. 409-416).

On September 18, 2017, plaintiff had a follow-up
appointment with Peter M. McIver, M.D. ("Dr. McIver"), during
which plaintiff reported joint pain but was otherwise feeling
better.  (Tr. 549).  Despite being thin and weighing 126 pounds,
the examination of plaintiff's mouth, eyes, pulmonary function,
abdomen, and range of motion were normal, and plaintiff was in
no acute distress.  (Tr. 549, 551).

On September 28, 2017, Dr. Gross examined plaintiff and
took note of his hospitalization in June 2017.  (Tr. 458).

Plaintiff denied fever and shortness of breath but did report dry mouth, dry eyes, fatigue (as noted by the ALJ), arthralgia, and left leg pain.  (Tr. 45, 458-59).  On examination, plaintiff appeared to be in no acute distress, had normal eyes, a dry mouth, normal pulmonary function, no swelling in the joints, a normal range of motion, and normal coordination.  (Tr. 460).  Dr. Gross noted that plaintiff continued to be underweight at 127 pounds, had a normal pulse oximeter reading of 98%, and was purchasing Ensure to supplement his meals and gain weight but had stopped because he could no longer afford it.  (Tr. 458-60).  During this same visit, Dr. Gross noted that "Sjogrens is possible" and prescribed Plaquenil and low dose prednisone "[f]or his Sjogrens."  (Tr. 458, 461).  Her office notes for the visit as well as subsequent visits reflect that plaintiff did not follow up with nephrology, as instructed, which the ALJ also noted.  (Tr. 45, 46, 50, 442, 458, 973).

On December 22, 2017, plaintiff saw Dr. McIver complaining of fever, chills, vomiting, and a runny nose.  (Tr. 537-38).  On examination, plaintiff exhibited normal pulmonary effort and normal breath sounds with "no wheezes" or rales.  (Tr. 541).  Dr. McIver diagnosed plaintiff with a viral upper respiratory infection and recommended plaintiff use cough medicine and "drink plenty of fluids."  (Tr. 541).

On February 21, 2018, plaintiff reported to Dr. Gross that his joint pain had resolved, and he had no fever, no chest pain, and no shortness of breath.  (Tr. 452, 454).  Dr. Gross' office notes do not indicate that plaintiff reported experiencing fatigue.  On examination, Dr. Gross documented: a normal pulse oximeter of 98%; a dry mouth; normal eyes; normal pulmonary effort and breath sounds; a normal range of motion in plaintiff's joints; and normal strength in plaintiff's joints. (Tr. 454).  She continued plaintiff's prescription for Plaquenil, restarted plaintiff on low dose prednisone, and noted his kidney function could "be followed with observation" if urine studies remained stable.  (Tr. 454-55).

On June 14, 2018, plaintiff had another appointment with Dr. Gross.  (Tr. 445).  Plaintiff reported knee pain "[m]ostly in his left knee," "riding his bike a lot" (as noted by the ALJ), and experiencing more shortness of breath with exercise. (Tr. 46, 446).  On examination, Dr. Gross noted a weight of 131 pounds, a BMI of 17.28, a dry mouth, normal eyes, normal pulmonary effort, normal breath sounds, no swelling, no fever, normal range of motion, normal coordination, dyspnea on exertion, keratoconjunctivitis sicca, membranous glomerulonephritis, and acute pain of the left knee.  (Tr. 445-48, 454).

On June 18, 2018, X-rays of plaintiff's knees showed a
"[s]light narrowing . . . at the medial compartments of both
knee joints suggesting mild degenerative change."  (Tr. 395).
On June 27, 2018, plaintiff complained of dry and itchy eyes at
an eye examination with ophthalmologist Kimberly Hsu, M.D. ("Dr.
Hsu").  (Tr. 1340).  During the same appointment, Dr. Hsu
inserted plugs into plaintiff's eyelids to address the dry eye
issue.  (Tr. 1340).  Plaintiff reported some improvement to his
dry and itchy eyes six weeks later on August 8, 2018.  (Tr.
1339).

On July 30, 2018, plaintiff underwent pulmonary function
testing ordered by Dr. Gross.  (Tr. 1107-08).  The pulmonary
function report suggested "primary restrictive pathophysiology"
and stated that clinical correlation would be required.  (Tr.
1107).

On August 13, 2018, plaintiff had an annual exam with his
primary care provider, William G. Griever, M.D. ("Dr. Griever"),
who found plaintiff negative for chest tightness, shortness of
breath, gastrointestinal problems, genitourinary symptoms,
numbness, and decreased concentration.  (Tr. 510-12).  However,
plaintiff did present with mild effusion in his left knee, pain
in both knees, and arthralgia in the left knee, "shoulder[,] and
left elbow."  (Tr. 511-12, 516-17).  Dr. Griever documented
plaintiff's weight as 132 pounds, which the ALJ also noted.

(Tr. 47, 510, 514).  Dr. Griever's office notes show: a BMI of 16.95; a normal pulse oximeter reading of 98%; mild clouding in the left eye; a normal pulmonary and abdominal exam; intact sensation and reflexes; and normal cognition and memory.  (Tr. 510-16).  Plaintiff's left knee showed mild effusion but no inflammation or laxity.  (Tr. 516).  Dr. Griever and plaintiff agreed his current medications were adequate to treat his conditions.  (Tr. 517).

On August 31, 2018, plaintiff complained of left knee pain to Dr. Griever.  (Tr. 505).  His office notes show that plaintiff's BMI had risen to 17.46.  (Tr. 505).  On examination, plaintiff experienced "pain with extreme flexion extension of the knee" and tenderness along the patellar ligament of the left knee with "no sign of laxity."  (Tr. 505-07).  He had a normal range of motion, intact strength, a normal gait, and clear lungs.  (Tr. 505-07).  Dr. Griever assessed that plaintiff had prepatellar bursitis of the left knee.  (Tr. 505, 507).  Dr. Griever increased the prednisone dose for three days to calm the inflammation in the left knee.  (Tr. 507).

On September 12, 19, and 25, 2018, plaintiff saw nurse practitioner Katie M. McNamara ("McNamara") for right sciatic pain and left knee pain.  (Tr. 488, 494, 499).  During these visits plaintiff was "negative" for "fatigue" and "shortness of breath."  (Tr. 488, 494, 500).  On examination, he exhibited

9

normal pulmonary effort at the September 19 and 25, 2018 visits, and normal breath sounds and a normal gait at all three visits. (Tr. 491, 496-97, 502).  McNamara noted left knee pain and assessed prepatellar bursitis.  (Tr. 491, 497).  Plaintiff's weight on September 25, 2018, was 140 pounds.  (Tr. 487, 490).

On October 4, 2018, plaintiff saw Jamie L. Marini ("Marini"), a physician assistant, and reported left knee pain that increased with walking.  (Tr. 480-81).  X-rays of the left knee showed unremarkable bones, no fracture, mild degenerative narrowing, and "[m]ild prepatellar soft tissue swelling similar to" the June 18, 2018 X-rays.[4]  (Tr. 393).  Marini provided plaintiff with a referral for physical therapy.  (Tr. 484).

On October 17, 2018, plaintiff reported left knee pain to Dr. Gross that wrapped around his entire knee.  (Tr. 439-40). Office notes do not indicate that plaintiff reported fatigue. (Tr. 439-42).  He weighed 144 pounds with a BMI of 18.96.  On examination, plaintiff had: a normal pulse oximeter reading; a normal pulmonary effort and breath sounds; a dry mouth; normal conjunctivae in the eyes; mild swelling in the left knee; a normal range of motion; and normal coordination.  (Tr. 442).

---

[4]   The October 5, 2018 X-rays of the left knee showed "mild degenerative narrowing and spurring" and "mild prepatellar soft tissue swelling" indicative of bursitis.  (Tr. 393).  The June 18, 2018 X-Rays showed a "[s]light narrowing at the medial compartment of both knee joints."  (Tr. 395).

Dr. Gross noted the assessment of prepatellar bursitis and a
significant improvement of his proteinuria relative to his
membranous glomerulonephritis.  (Tr. 48, 442-43).

On November 29, 2018, plaintiff attended a physical therapy
session during which he again reported left knee pain.  (Tr.
1245).  Plaintiff exhibited a decreased range of motion, reduced
strength on his left side, and a "marked antalgic gait."  (Tr.
970-71).  Therapy notes state that plaintiff uses a cane, which
the ALJ acknowledges.[5]  (Tr. 48, 970).  During the course of
plaintiff's physical therapy treatment from November 29, 2018 to
January 4, 2019 (Tr. 1241-61), plaintiff experienced an increase
in left knee flexion from 90 degrees initially to 115 degrees as
of December 28, 2018 (Tr. 1241, 1259).  Although he progressed
during physical therapy, he continued to complain of "pain as
[a] limiting factor for functional activity," as noted by the
ALJ.  (Tr. 48, 1335).  Plaintiff completed seven of the 12
recommended appointments.  (Tr. 48, 1241-61).

On January 16, 2019, state agency physician John Jao, M.D.
opined that plaintiff could: occasionally lift up to 20 pounds;
frequently lift up to ten pounds; stand or walk for four hours;
sit for six hours; and should avoid concentrated exposure to
extreme cold, pulmonary irritants, and hazards.  (Tr. 122-24).

---

[5]  Plaintiff testified that the physical therapist suggested he
use a cane to maintain stability.  (Tr. 84).

On January 24, 2019, state agency psychologist Michelle L. Imber, Ph.D. reviewed the record and classified plaintiff's Sjögren's syndrome, dysfunction of major joints, nephrotic syndrome, depression, and anxiety as severe impairments. (Tr. 120-21).

On April 25, 2019, plaintiff told Dr. Griever he was "feeling reasonably well." (Tr. 1351). He also reported knee pain but without swelling. (Tr. 1351). Dr. Griever's office notes fail to reflect that plaintiff reported fatigue. (Tr. 1350-57). Regarding his membranous glomerulonephritis kidney condition, Dr. Griever's notes state "[h]e has had very little difficulties regarding protein in the urine." (Tr. 1351). On examination, Dr. Griever noted plaintiff's clear lungs "with good air exchange," normal abdomen, stable recurring pneumonia, and a 15-pound weight gain to 153 pounds in the last three months, as also noted by the ALJ (Tr. 49). (Tr. 1350-57). Dr. Griever's examination of plaintiff's left knee showed no swelling "of any significance" and both knees had good range of motion. (Tr. 1352).

On June 4, 2019, plaintiff presented to Plymouth Cordage Park Urgent Care ("Plymouth Urgent Care") for cough, chest congestion and tightness, mild sore throat, sweats, chills, and "increased tactile warmth." (Tr. 1370). Plaintiff denied experiencing shortness of breath. (Tr. 1370). He was diagnosed

12

with an upper respiratory infection and prescribed doxycycline for ten days and an albuterol inhaler. (Tr. 1371). Plaintiff's weight was recorded as 155 pounds with a BMI of 20.32. (Tr. 1371).

On June 26, 2019, plaintiff informed Dr. Gross he was feeling better since his visit to urgent care after taking antibiotics. (Tr. 1374-75). Plaintiff further noted he felt out of breath walking long distances but not with day-to-day activities, as noted by the ALJ. (Tr. 49, 1375). On examination, plaintiff had a dry mouth, "mild crackles" in his lungs, normal eyes, a normal abdomen, mild soft tissue swelling in his left knee, a normal range of motion, normal strength, and normal coordination. (Tr. 1376-77). Dr. Gross recommended plaintiff "undergo a chest x-ray and updated pulmonary function tests due to the crackles she detected on pulmonary exam." (Tr. 49-50, 1377). She also stated that plaintiff's Sjögren's syndrome was "doing well on low dose prednisone and [P]laquenil." (Tr. 1377).

On July 16, 2019, plaintiff's pulmonary function test suggested a restrictive lung pattern, as noted by the ALJ. (Tr. 50, 1385). Plaintiff's lung capacity and diffusion showed improvement since the previous summer, as likewise noted by the ALJ. (Tr. 50, 1385).

B. <u>Mental Conditions</u>

Plaintiff has experienced depression and anxiety since 2009 or 2010 (Tr. 569, 576) with two past attempts at suicide (Tr. 572).  On April 24, 2017, he began seeing a therapist at South Shore Mental Health's North River Associates in Marshfield, Massachusetts "every two weeks" for depression and anxiety. (Tr. 83, 569-573).  His current medications include Zoloft and gabapentin.  (Tr. 83, 569).  On June 8, 2017, Allan Giesen, M.D., D.O. ("Dr. Giesen"), plaintiff's psychiatrist at the time, doubled plaintiff's dose of Zoloft from 50 milligrams to 100 milligrams and prescribed Neurontin.  (Tr. 44, 580).  At a follow-up appointment with Dr. Giesen on July 27, 2017, he restarted the Neurontin, after a discontinuation of the medicine during the June 2017 hospitalization, in light of plaintiff's report that he "felt much better with the [N]eurontin."  (Tr. 45, 366).

Plaintiff returned to Dr. Giesen on September 21, 2017 and reported "good stability with [Z]oloft and [N]eurontin."  (Tr. 45, 369).  On February 15, 2018, plaintiff had a follow-up visit with Dr. Giesen and again reported "good stability" with his treatment.  (Tr. 46, 372).  Dr. Giesen noted that plaintiff's memory, concentration, and insight were within normal limits. (Tr. 46, 372-73).  On June 22, 2018, plaintiff saw Dr. Giesen again and reported "fairly good stability" with his treatment. (Tr. 46, 388).

On December 28, 2019, plaintiff had a mental health
appointment with a nurse practitioner at North River Associates.
He reported an anxious mood "due to homelessness." (Tr. 48,
586). He also reported that his medications were "working."
(Tr. 586). On examination, his attention, memory, judgment,
insight, and concentration fell within normal limits. (Tr. 48,
586-87). At a follow-up appointment on February 1, 2019,
plaintiff reported he was doing well. (Tr. 49, 1297).

III.  <u>ALJ Hearing</u>

Plaintiff testified he was first diagnosed with Sjögren's
syndrome in July 2017. (Tr. 78). He described his symptoms of
the syndrome as including dry eyes, a dry mouth, joint pain,
fatigue, and "flare-ups of pneumonia-like symptoms" accompanied
with difficulty breathing. (Tr. 78-80). Plaintiff testified
that the syndrome causes his keratoconjunctivitis sicca, which
makes his eyes feel itchy and constantly dry. (Tr. 80). On
June 27, 2018, Dr. Hsu inserted punctal plugs in plaintiff's
eyes to alleviate the itchy and dry eyes, but it only helped "a
little," and he continues to use gel drops for dry eyes,
according to plaintiff. (Tr. 80, 1339). Plaintiff also
described a constant dryness in his mouth alleviated only by
sucking on candy or drinking fluids. (Tr. 80).

Plaintiff testified that Sjögren's syndrome also causes
joint pain in his knees, shoulders, and elbows. (Tr. 78, 81-

82).  He characterized the most severe joint pain as coming from
the left knee.  (Tr. 81).  He described the right knee as "under
constant strain and pain" because he favors it to walk.  (Tr.
81).

With respect to his weight, plaintiff testified he weighed
157 pounds, which he described as "underweight for [his] body
size" and had only gained "a few pounds" since the diagnosis.
(Tr. 79-80).  From September 2017 until the August 2019 ALJ
hearing, however, plaintiff's weight increased from 126 pounds
to 157 pounds.  (Tr. 79, 549).  He described that Sjögren's
syndrome causes his shoulders to feel cramped and painful with a
feeling of "a hot needle in the center of them."  (Tr. 78, 81-
82).  Plaintiff stated that his feet and occasionally his hands
feel like they are on "pins and needles."  (Tr. 80-81).

Due to his pain, plaintiff has difficulty sitting,
standing, and walking for long periods of time, according to his
testimony.  (Tr. 74-75).  The pain is "[m]ostly in [his] left
knee."  (Tr. 75).  Plaintiff testified to feeling pain daily,
"[a]lmost every other hour," and that the level of pain falls
between eight and ten on a ten-point scale.  (Tr. 75).
Plaintiff described difficulty going up and down stairs, using
his right foot first going up the stairs and leading with his
left foot and a cane going down the stairs.  (Tr. 76-77).

During a typical day, he spends time "on [his] tablet" and "just trying to be comfortable."  (Tr. 76).  He occasionally visits friends and socializes with them by watching television and playing cards, according to his testimony.  (Tr. 76).  Plaintiff stated he can only sit or stand for a period of ten to 15 minutes before experiencing discomfort.  (Tr. 76).  Cold weather exacerbates his joint pain.  (Tr. 465).

Although he spoke with his rheumatologist about pain medication, he explained he can only take Tylenol for pain because anti-inflammatory medication interferes with his Plaquenil and prednisone medications.  (Tr. 82-83).  He noted that Zoloft and prednisone make his fatigue "worse" and gabapentin makes him feel lightheaded.  (Tr. 82).  He experiences "constant fatigue" as a symptom of Sögren's syndrome, according to his testimony.  (Tr. 78).

Plaintiff stated he has flare-ups that include pneumonia-like symptoms due to Sjögren's syndrome.  (Tr. 78).  When asked if he was diagnosed with a breathing condition because of Sjögren's syndrome, he stated "[i]t's speculated that [he has] COPD because of [Sjögren's]."  (Tr. 78).  He noted he has been hospitalized on several occasions because of breathing difficulties.  He has an inhaler for COPD, which he estimates using "once or twice a day."  (Tr. 78-79).

<u>DISCUSSION</u>

17

I.  Jurisdiction and Standard of Review

This court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding the case for a hearing. 42 U.S.C §§ 405(g), 1383(c)(3).  Findings of fact by the ALJ are conclusive if they are supported by substantial evidence.  See Richardson v. Perales, 402 U.S. 389, 390 (1971); Seavey v. Barnhart, 276 F.3d 1, 9-10 (1st Cir. 2001); Manso-Pizarro v. Sec'y of Health and Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).  The ALJ's findings of fact are not conclusive if the ALJ derived such facts by "ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  It is the court's task to determine "whether the final decision is supported by substantial evidence and whether the correct legal standard was used."  Seavey, 276 F.3d at 9.

Substantial evidence is "more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not" required.  Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (quoting Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003)) (internal quotation marks omitted); Bath Iron Works, 336 F.3d at 56 (substantial evidence standard "is notoriously difficult to overcome" and, while "'more than a scintilla,' it certainly does not approach

the preponderance-of-the-evidence standard normally found in civil cases") (emphasis added and internal citation omitted). Thus, this court must affirm the ALJ's conclusion if it is supported by substantial evidence, "even if the record arguably could justify a different conclusion." Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).

Substantial evidence exists where, "'reviewing the evidence in the record as a whole,'" a reasonable mind "'could accept it as adequate to support the Commissioner's conclusion.'" Purdy, 887 F.3d at 13 (quoting Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). In addition, credibility issues are the "'prime responsibility'" of the Commissioner, and conflicts in the evidence as well as the "determination of the ultimate question of disability" are for the Commissioner, "not for the doctors or for the courts," to decide. Rodriguez, 647 F.2d at 222 (internal citation omitted).

II.  Disability Determination

To receive SSI and SSDI, a claimant "must show that [he] had a disability" which began before or during the period between the date of his application for benefits and the date of the ALJ's decision and "which lasted or was likely to last at least twelve months." Johnson v. Colvin, 204 F. Supp. 3d 396, 401 (D. Mass. 2016). The Social Security Act defines a disability as the:

> [Inability] to engage in any substantial gainful activity
> by reason of any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3); see 42 U.S.C. § 423(d)(1)(A).

Impairments must be of such a severity that the claimant is not only unable to do his previous work but, in consideration of his "age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3); see 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled within the meaning of the statute, the ALJ applies a sequential, five-step evaluation process and considers all of the evidence in the record.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see Goodermote v. Sec'y of Health and Human Servs., 690 F.2d 5, 6 (1st Cir. 1982).  At the first step, the claimant is not disabled if he or she is currently employed.  See Goodermote, 690 F.3d at 6.  If the claimant is not employed, the ALJ proceeds to the second step to evaluate whether or not the claimant has a severe impairment or combination of impairments.  See id.  A severe impairment or combination of impairments must meet a durational requirement of "a continuous period of at least 12 months" and must significantly limit the claimant's

"physical or mental ability to do basic work activities."  20
C.F.R §§ 404.1509, 404.1520(c), 416.909, 416.920(c).

If the claimant is not found to have a severe impairment or
combination of impairments, he or she is not disabled.  See
Goodermote, 690 F.2d at 6.  If the claimant has a severe
impairment or combination of impairments, the analysis proceeds
to the third step, in which the ALJ must determine whether the
claimant's severe impairment or combination of impairments meets
or is medically equivalent to one of the impairments listed in
Appendix 1, Subpart P, Part 404 of the Code of Federal
Regulations ("Appendix 1").  20 C.F.R. §§ 404.1520(d),
416.920(d); see Goodermote, 690 F.2d at 6.  If the impairment or
combination of impairments meets or is medically equivalent to a
listed impairment, then the claimant is disabled.  If not, the
analysis proceeds to step four.  See Goodermote, at 6-7.

At step four, the ALJ must determine whether the claimant
is capable of performing any of his past relevant work by
comparing the claimant's current residual functional capacity
("RFC") with the mental and physical demands of the claimant's
past work.  See 20 C.F.R. §§ 404.1520(a)(4), 404.1520(e),
916.920(a)(4), 916.920(e); Manso-Pizarro, 76 F.3d at 17.  If the
claimant can perform his past relevant work, the claimant is not
disabled.  See Goodermote, 690 F.2d at 7.  In the first four
steps, the burden to provide evidence and to prove an inability

21

to perform past work rests with the claimant.  See Manso-Pizzaro, 76 F.3d at 17; Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001) ("applicant has the burden of production and proof at the first four steps of the process").

If the claimant successfully satisfies his burden by showing he can no longer perform his past work, the burden shifts to the Commissioner to show the existence of other jobs in the national economy that the claimant could perform.  20 C.F.R. §§ 404.1520(g), 416.920(g), 404.1560(c), 416.960(c); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); Rosado v. Sec'y of Health and Human Servs., 807 F.2d 292, 294 (1st Cir. 1986). In making this determination at step five, the ALJ must consider the claimant's RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 416.920(g), 404.1560(c), 416.960(c).  The claimant is not disabled if jobs the claimant can perform exist in significant numbers in the national economy.  20 C.F.R. §§ 404.1560(c), 416.960(c), 404.1520(g), 416.920(g).

III.  ALJ Decision

At the August 6, 2019 hearing, the ALJ heard testimony from plaintiff and the VE.  (Tr. 63-89).  After reviewing the record and testimony from plaintiff and the VE, the ALJ applied the requisite five-step analysis and determined that plaintiff was not disabled at step five.  (Tr. 36-56).

At step one, the ALJ found that plaintiff "has not engaged in substantial gainful activity since June 26, 2017, the alleged onset date."  (Tr. 39).  At step two, the ALJ found that plaintiff's Sjögren's syndrome, COPD, nephrotic syndrome, left knee prepatellar bursitis, anxiety, and a depressive disorder were severe impairments.  (Tr. 39).

At step three, the ALJ ascertained that although plaintiff has severe impairments, he did not have an impairment or combination of impairments that met the severity of one of the listed impairments in Appendix 1.  (Tr. 38-39).  Under listing 1.02 of Appendix 1, which addresses major dysfunction of one or more joint(s), the ALJ found that the relevant medical evidence did not satisfy subsection 1.02(A)'s requirement of an "involvement of one major peripheral weight-bearing joint resulting in an inability to ambulate effectively" or subsection 1.02(B)'s requirement of an "involvement of one major peripheral joint in each upper extremity resulting in an inability to perform fine and gross movements effectively."  (Tr. 39); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.

Under listing 6.06 of Appendix 1 regarding plaintiff's nephrotic syndrome, the ALJ determined that the medical evidence failed to show laboratory findings "accompanied by anasarca persisting for at least 90 days despite prescribed treatment." (Tr. 39); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 6.06.  Under

23

listing 3.02 of Appendix 1 regarding chronic pulmonary insufficiency, the ALJ concluded that the medical evidence did "not demonstrate the existence of results on pulmonary function testing" to satisfy the listing.  (Tr. 39, 50); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02.

Under listing 14.10, captioned "Sjögren's syndrome," the ALJ found that the medical evidence did not substantiate the "involvement of two or more organs or body systems to at least a moderate level of severity with at least two constitutional symptoms or signs or repeated manifestations of the syndrome with at least two constitutional symptoms or signs and marked limitations in activities of daily living, social functioning, or concentration deficiencies."  (Tr. 39-40).  With respect to this finding, plaintiff argues "the ALJ failed to consider all of the evidence presented both by way of medical documentation and at the hearing" and, "[i]f he had done so, he would have found that [plaintiff] met listing 14.10."  (Docket Entry # 16, p. 11).

With respect to plaintiff's mental impairments at step three, after examining sections 12.04 and 12.06 in Appendix 1 relative to plaintiff's anxiety and depression, the ALJ determined the severity did not meet the required paragraph B or paragraph C criteria.  (Tr. 40-42).  The ALJ found plaintiff had a moderate limitation in understanding, remembering, or applying

information.  (Tr. 40).  The ALJ noted that plaintiff's mental status examinations showed: plaintiff was fully oriented in all spheres; his thought process was coherent, logical, and goal-directed; and he had no noted memory abnormalities, which the record supports.  (Tr. 40, 341-42, 384, 388, 571-72, 576, 580).

The ALJ also determined plaintiff had a moderate limitation in interacting with others.  (Tr. 40).  The ALJ noted the record did not contain significant interpersonal conflicts aside from plaintiff being fired from a job due to a disagreement with his supervisor.  (Tr. 40, 284).  Citing an adult function report, the ALJ noted that plaintiff reported he shopped in the community (Tr. 281) and regularly visited friends (Tr. 282). (Tr. 40).  The ALJ also pointed to treatment notes indicating plaintiff related "well with his providers," maintained good eye contact, and advocated appropriately for his medical care, which the record supports.  (Tr. 40, 341-42, 349, 357-58, 364, 367, 370, 373, 386-87, 389, 587, 884, 1285, 1351).

The ALJ found plaintiff had a moderate limitation regarding concentrating, persisting, or maintaining pace.  (Tr. 40).  The ALJ likewise found plaintiff had a moderate limitation for adapting or managing himself.  (Tr. 41).  As support, the ALJ cited, inter alia, plaintiff's self-reported ability to prepare his own meals, shop for food and clothing, manage his finances, and socialize regularly with friends.  (Tr. 41, 281-82).

After step three, the ALJ determined and explained the RFC. In this section of the opinion, the ALJ summarized the record, assessed plaintiff's symptoms and statements, and addressed plaintiff's Sjögren's syndrome.  He explained that treatment notes by plaintiff's primary care provider (Dr. Griever) and his rheumatologist (Dr. Gross) indicated the "condition is fairly well-controlled with the combination of low-dose Prednisone and Plaquenil."  (Tr. 50).  Regarding plaintiff's COPD, the ALJ relied on the pulmonary function test results from July 2019 which "reflect[ed] improvement from previous testing performed in June 2018."  (Tr. 50).  The ALJ noted a stabilization of plaintiff's nephrotic syndrome even though plaintiff did not attend a follow-up appointment with the nephrologist following the June 2017 hospitalization.  (Tr. 50).  Separately, the ALJ noted plaintiff's contradictory testimony that he cannot "sit, stand or walk for too long" due to the pain, but that plaintiff also "prepares his own meals, shops for food and clothing, manages his finances and does his own laundry, albeit with some difficulty."  (Tr. 50-51).

At step four, the ALJ determined plaintiff was unable to perform his past relevant work.  (Tr. 54).  At step five, the ALJ considered all of plaintiff's symptoms and determined plaintiff had the RFC to perform sedentary work subject to certain limitations.  (Tr. 42).

IV.  Arguments

In seeking to reverse or, in the alternative, remand the decision of the Commissioner (Docket Entry # 15), plaintiff primarily argues that the ALJ ignored or failed to consider all of the evidence when he evaluated plaintiff under listing 14.10 at step three.  (Docket Entry # 16, pp. 10-14).  Plaintiff maintains the ALJ should have ended the analysis at step three because plaintiff meets or equals the requirements of listing 14.10.  (Docket Entry # 16, p. 9).  Relatedly, plaintiff argues the ALJ misapplied the law because "the ALJ should have concluded his analysis at step 3 of the five-step analysis, as [plaintiff] meets or equals Listing 14.10 for Sjogren's Syndrome."  (Docket Entry # 16, pp. 9-10).  Plaintiff briefly states the ALJ misapplied the law when he "improperly determined that [plaintiff] is capable of engaging in work at a 'sedentary' exertional level" at step five.[6]  (Docket Entry # 16, p. 9).

A.  Listing 14.10 Ignoring Evidence Arguments

Under step three, Sjögren's syndrome must satisfy either subsection 14.10A or 14.10B of listing 14.10.  Subsection 14.10A entails a two-part showing, first under subsection 14.10A.1 and

---

[6]   As explained in Roman numeral IV(B), the Commissioner correctly contends that plaintiff does not develop and therefore waives the argument that the ALJ improperly determined plaintiff was able to work at the sedentary level.  (Docket Entry # 18, p. 17).

second under subsection 14.10A.2.  Subsection 14.10B requires

two or more "constitutional symptoms or signs" and a marked

level of at least one of three limitations identified in the

subsection.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.10.

Listing 14.10 reads as follows:

> A. Involvement of two or more organs/body systems, with:
>   1. One of the organs/body systems involved to at least a
> moderate level of severity; and
>   2. At least two of the constitutional symptoms or signs
> (severe fatigue, fever, malaise, or involuntary weight
> loss).
> or
> B. Repeated manifestations of Sjögren's syndrome, with at
> least two of the constitutional symptoms or signs (severe
> fatigue, fever, malaise, or involuntary weight loss) and
> one of the following at the marked level:
>   1. Limitation of activities of daily living.
>   2. Limitation in maintaining social functioning.
>   3. Limitation in completing tasks in a timely manner due
> to deficiencies in concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.10.  The ALJ

considered plaintiff's Sjögren's syndrome under both subsection

14.10A and subsection 14.10B and concluded, based on "the entire

record" (Tr. 38), that the impairment did not meet or equal

listing 14.10 at step three.  (Tr. 39-40, 43-53).

1.  <u>Two or More Constitutional Symptoms or Signs</u>

Plaintiff argues that the ALJ erred by ignoring medical

evidence which demonstrates plaintiff suffers from involuntary

weight loss and severe fatigue and therefore meets the criteria

of subsections 14.10A.2 and 14.10B.  (Docket Entry # 16, p. 12).

The Commissioner maintains that although plaintiff has Sjögren's

syndrome, the ALJ appropriately weighed plaintiff's own statements regarding his fatigue and weight loss as well as Dr. Griever's and Dr. Gross' opinions and correctly ruled that the record did not show "at least two of the constitutional symptoms or signs" required to satisfy either subsection 14.10A.2 or subsection 14.10B. (Docket Entry # 18, pp. 8-11). The Commissioner is correct.

As set out in the language of listing 14.10, both subsection 14.10A.2 and subsection 14.10B require "[a]t least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.10; accord Stawaisz v. Colvin, Civil Action No. 8:11-cv-3519-JMC, 2013 WL 5139599, at *3 (D.S.C. Sept. 12, 2013) ("[l]isting 14.10 makes clear that absent . . . two constitutional symptoms, the ALJ cannot make a finding that Plaintiff suffers from Sjögrens syndrome" under listing 14.10). "To satisfy a listing, a claimant must present evidence of medical findings that meet all specified medical criteria or are equal in severity to all the criteria for the most similar listed impairment." Avila v. Berryhill, Civil Action No. 18-10898-FDS, 2019 WL 2537638, at *8 (D. Mass. June 20, 2019) (citing Sullivan v. Zebley, 493 U.S. 521, 530 (1990)). An impairment which "'manifests only some of those criteria, no matter how severely, does not qualify.'" Zebley, 493 U.S. at

530 (citation omitted).  Moreover, the plaintiff must "'have

suffered, or be expected to suffer, all the elements of a listed

impairment continuously for twelve months.'"  Myers v.

Berryhill, Case No. 3:18-cv-30122-KAR, 2019 WL 3976017, at *15

(D. Mass. Aug. 21, 2019) (citation omitted).  The parties agree

that the SSI and SSDI applications allege a disability beginning

on June 26, 2017.  (Docket Entry # 16, p. 1) (Docket Entry # 18,

p. 2) (Tr. 212, 214).

      In connection with the ALJ's assessment of Sjögren's

syndrome at step three, it is appropriate to consider the ALJ's

decision as a whole.  See West v. Berryhill, No. 17–1170, 2017

WL 6499834, at *1 (1st Cir. Dec. 11, 2017) ("court considers the

ALJ's decision as a whole when determining whether substantial

evidence supported the ALJ's findings"); Keene v. Berryhill, 732

Fed. App'x 174, 177 (4th Cir. 2018) (reading decision as a whole

in assessing step-three finding) (citation omitted).  The ALJ's

reasoning and findings elsewhere in the opinion regarding

plaintiff's Sjögren's syndrome and symptoms may therefore inform

and clarify the ALJ's reasoning at step three.  See Curvin v.

Colvin, 778 F.3d 645, 650 (7th Cir. 2015) (ALJ's discussion of

RFC, which set out impairments, objective medical evidence, and

credibility findings, provide basis to affirm ALJ's step-three

determination even though ALJ did not identify specific listed

impairment); Forrest v. Comm'r of Soc. Sec., 591 F App'x 359,

366 (6th Cir. 2014) (ALJ's finding elsewhere in decision
sufficient to support conclusory finding at step three);
Fischer-Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005)
("ALJ's findings at other steps" provide "proper basis" to
uphold "step three conclusion that a claimant's impairments do
not meet or equal any listed impairment"); Tenney v. Comm'r of
Soc. Sec. Admin., Case No. 4:20-CV-01569-JG, 2021 WL 4393538, at
*7 (N.D. Ohio Sept. 9, 2021) (ALJ's failure "to specifically
discuss a listing 'does not require a remand if the ALJ "made
sufficient factual findings elsewhere in his decision to support
his conclusion at step three"'") (citations omitted); accord
Keene, 732 Fed. App'x at 177 ("courts have determined that an
ALJ's step-three conclusion . . . can be upheld based on the
ALJ's findings at subsequent steps") (citation omitted); Coppola
v. Colvin, Civil No. 12-cv-492-JL, 2014 WL 677138, at *4 n.4
(D.N.H. Feb. 21, 2014) (ALJ's lack of analysis at step three
"irrelevant" because ALJ's lengthy analysis of medical record
relative to RFC evidences ALJ's reliance on "this analysis in
making findings at step 3").

    Plaintiff submits that his involuntary weight loss and
severe fatigue meet the criteria of subsections 14.10A and
14.10B.  (Docket Entry # 16, p. 12).  Regarding "involuntary
weight loss," substantial evidence supports the ALJ's
determination that "the medical evidence of record does not

substantiate . . . at least two constitutional symptoms or
signs" under listing 14.10.  (Tr. 39-40).  It is true that
plaintiff's weight was 126 pounds on September 18, 2017, and
that Dr. Gross' notes on September 28, 2017 describe plaintiff
as "[s]till losing weight" while drinking Ensure, as noted by
the ALJ.  (Tr. 45, 459).  Thereafter, however, the record
evidences plaintiff's weight gain, as further noted by the ALJ.
(Tr. 47, 49).  During the 12-month period following the alleged
June 26, 2017 onset of disability, plaintiff's weight
consistently increased.  Having stopped taking Ensure in
September 2017 (Tr. 45, 459), plaintiff's weight was 131 pounds
as of June 14, 2018 (Tr. 445), 132 pounds as of August 13, 2018
(Tr. 47, 510), 140 pounds as of September 25, 2018 (Tr. 487,
490), 144 pounds as of October 17, 2018 (Tr. 442), and 153
pounds as of April 25, 2019 (Tr. 49, 1350).  After citing Dr.
Gross' description of plaintiff as continuing to lose weight as
of September 28, 2017, the ALJ identified plaintiff's weight as
132 pounds as of August 13, 2018, and 153 pounds as of April 25,
2019.  (Tr. 47, 49, 512, 1352).  Regarding the latter, the ALJ
noted that plaintiff "gained 15 pounds in the past three
months," which is fully supported in the record (Tr. 49, 1352),
and testified to weighing 157 pounds at the hearing (Tr. 43,
79).

The ALJ explicitly considered Dr. Griever's April 1, 2019 opinion but determined it was not "persuasive because it" was unsupported; it was "unclear which symptoms, signs, or manifestation" Dr. Griever based his opinion upon; and it was inconsistent with the medical evidence in the record showing that plaintiff received "routine and conservative treatment" and had no "emergent treatment of symptoms of Sjögren's syndrome since diagnosed in 2017." (Tr. 52).  The opinion consists of a typed form, which reproduces verbatim listing 14.10 with Dr. Griever's signature and circled entries.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.10; (Tr. 1305-1306).  Therein, Dr. Griever circled the provision that recites subsection 14.10A.2 ("At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).").  (Tr. 1305).  He also circled the limitation in subsection 14.10B.1 for "activities of daily living" and the limitation in subsection 14.10B.3 for "completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." (Tr. 1306).  Immediately above Dr. Griever's signature, the form includes a space to insert the claimant's name into a sentence: "I agree _____ meets the above aspects of disability listing 14.10." (Tr. 1306).  Plaintiff's name is handwritten into the space provided.  (Tr. 1306).

An ALJ "must consider the persuasiveness of all medical opinions in a claimant's case record and need not defer to the medical opinions of a claimant's treating physician[]," such as Dr. Griever.   Harrison v. Saul, Civil No. 20-10295-LTS, 2021 WL 1153028, at *5 (D. Mass. March 26, 2021).  Whereas the ALJ considers a range of factors in evaluating opinions or findings by a medical source such as Dr. Griever, "[t]he most important factors" in "evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability" and "consistency."  20 C.F.R. §§ 404.1520c, 416.920c; Harrison, 2021 WL 1153028, at *5 (in determining weight to assign "medical source opinion," ALJ considers "supportability, consistency, relationship, specialization, and other factors").  Put another way, "'a medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, is not persuasive regardless of who made the medical opinion.'" Harrison, 2021 WL 1153028, at *5 (citation and ellipses omitted).

A supportable medical source opinion is likely to include relevant "objective medical evidence and supporting explanations."  20 C.F.R. §§ 404.1520c, 416.920c.  Here, Dr. Griever gave no explanation for the opinion or finding.  The objective medical evidence also fails to support Dr. Griever's implicit opinion of "involuntary weight loss" during the 12-

34

month period beginning on June 26, 2017.  Indeed, after September 2017, as set out above, plaintiff's objectively recorded weight repeatedly evidences weight gain.

Consistency is also lacking.  The relevant guidepost instructs that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. §§ 404.1520c, 416.920c.  The medical findings of plaintiff's recorded weight gain and BMI are not consistent with Dr. Griever's opinion of two or more constitutional symptoms or signs to the extent the opinion includes involuntary weight loss as one of those constitutional symptoms.  The ALJ therefore appropriately discounted the opinion as "unsupported," inconsistent with the medical evidence indicating "routine and conservative treatment," and "unclear."  (Tr. 52).

With the ALJ having considered and appropriately discounted Dr. Griever's opinion, the foregoing record of weight gain provides substantial evidence to support the ALJ's finding that the medical evidence does not substantiate at least two or more constitutional symptoms with one of the two being involuntary weight loss.  Cf. Mahoney v. Comm'r of Social Security Administration, No. 1:17-cv-03106-SAB, 2018 WL 1684455, at *4

35

(E.D. Wash. Feb. 8, 2018) (finding "record indicates involuntary weight loss; Plaintiff lost thirty pounds in a four-month timespan, as noted by her physician").

In addition to involuntary weight loss, plaintiff argues that he meets the criteria for subsection 14.10A.2 because he "suffers from severe fatigue." (Docket Entry # 16, p. 12). Dr. Griever's opinion, assuming Dr. Griever relied on severe fatigue as a constitutional symptom or sign, has no explanation for a finding of fatigue. (Tr. 1305-06); see 20 C.F.R. §§ 404.1520c, 416.920c.[7] In addition, the assumed finding of severe fatigue is not consistent with the record. Here again, the ALJ properly discounted the opinion, to the extent Dr. Griever implicitly found severe fatigue as one of the constitutional signs or symptoms. Although plaintiff reported fatigue to Dr. Gross during the September 28, 2017 visit, as recognized by the ALJ, he denied fatigue to McNamara in September 2018. (Tr. 45, 458,

---

[7]   Plaintiff fails to cite or address Dr. Griever's RFC findings, and therefore waives any reliance or finding therein regarding fatigue as a constitutional symptom or sign. See Novick v. Colvin, Civil Action No. 16-11143-FDS, 2017 WL 1553162, at *7 n.9 (D. Mass. Apr. 27, 2017) ("plaintiff's motion to reverse or remand does not address that point, and he is therefore deemed to have waived that argument"); accord Eldridge v. Gordon Bros. Grp., L.L.C., 863 F.3d 66, 84 (1st Cir. 2017) (rejecting plaintiff's argument that district judge should have addressed plaintiff's waived summary judgment argument in plaintiff's opposition).

488, 494, 500).  During the February 21, 2018 visit with Dr.
Gross and the June 4, 2019 visit to Plymouth Urgent Care,
plaintiff denied experiencing shortness of breath, as also noted
by the ALJ.  (Tr. 46, 452, 1370).  Furthermore, he reported
"riding his bike a lot" to Dr. Gross at the June 14, 2018 visit,
as noted by the ALJ, as well as engaged in a range of daily
activities, as also noted by the ALJ.  (Tr. 46, 50-51, 76, 278-
279, 446).  Accordingly, substantial evidence exists for the
ALJ's finding that the medical evidence does not substantiate at
least two or more constitutional symptoms with one of the two
being severe fatigue.

In sum, the ALJ considered "the entire record" (Tr. 38) and
appropriately determined that Dr. Griever's check-marked opinion
that plaintiff satisfied two or more constitutional symptoms or
signs, which the opinion does not identify, was not persuasive.
Substantial evidence supports the ALJ's determination (Tr. 40)
of the absence of two or more constitutional signs or symptoms
with respect to involuntary weight loss and severe fatigue.

Substantial evidence also supports the ALJ's finding that
the evidence did not support the degree of physical limitations
plaintiff espoused at the hearing (Tr. 50-51), such as constant
fatigue (Tr. 78) and the inability to gain more than "a few
pounds" after the Sögren's diagnosis (Tr. 79), given the lack of
support in medical examination notes and plaintiff's daily

37

activities.  (Tr. 47, 49, 50-51) (noting "weight loss" and
"fatigue" as physical impairments, reciting inconsistent aspects
of medical record, and discounting physical impairments as "not
generally consistent with" daily activities).  The ALJ
acknowledged plaintiff's testimony "concerning his diagnosis
with Sjogren's syndrome," including his testimony that he
experiences "weight loss," his unsuccessful attempt "to gain
weight by drinking nutritional supplements," and his "fatigue."
(Tr. 43).  The ALJ aptly discounted plaintiff's statements
concerning the intensity and persistence of plaintiff's
symptoms, including weight loss and fatigue, as "not entirely
consistent with the medical evidence and other evidence in the
record."  (Tr. 43).  He specifically noted the weight gain in
the medical record (Tr. 47) (132 pounds as of August 13, 2018);
(Tr. 49) (153 pounds and a 15-pound gain as of April 25, 2019)
and plaintiff's activity of "riding his bike a lot."  (Tr. 46).
He also found that the fatigue was inconsistent with plaintiff's
ability to perform various daily activities (Tr. 50-51).  See
Linhares v. Kilolo Kijakazi, Civil Action No. 1:20-cv-10899-IT,
2021 WL 4459701, at *9 (D. Mass. Sept. 29, 2021).  Plaintiff's
contention that the ALJ misapplied subsections 14.10A.2 and
14.10B to the facts by ignoring or failing to consider all of
the evidence is mistaken.

Because at least two constitutional symptoms or signs are required to satisfy subsections 14.10A.2 and 14.10B and substantial evidence supports the ALJ's finding to the contrary, it is not necessary to address plaintiff's additional argument that the ALJ failed to consider the evidence that plaintiff "presents a moderate level of severity" regarding his left knee, lungs, and/or gastrointestinal system (Docket Entry # 16, pp. 11-12) sufficient to satisfy subsection 14.10A.1.  See Avila, 2019 WL 2537638, at *8 (claimant must present evidence meeting "all specified medical criteria" or evidence "equal in severity to all the criteria" for listed impairment); accord Zebley, 493 U.S. at 530; Myers, 2019 WL 3976017, at *15.  Likewise, it is not necessary to address plaintiff's argument that the ALJ ignored the evidence of the "limitations on his activities of daily living" (Docket Entry # 16, p. 12) and plaintiff therefore met the criteria in subsection 14.10B.1.  Nevertheless, to complete the record, this court will examine these two additional arguments.[8]

---

[8]   Plaintiff's additional argument that he "has repeated manifestations of Sjogren's Syndrome, including dry eyes, kidney issues, discoloration of his fingers, and joint pain," and therefore meets the criteria in listing 14.10B (Docket Entry # 16, p. 12) is not adequately developed and therefore waived. See McDonough v. Donahoe, 673 F.3d 41, 49 n.14 (1st Cir. 2012) (deeming "conclusory, undeveloped" appellate arguments waived); Curet-Velázquez v. ACEMLA de Puerto Rico, Inc., 656 F.3d 47, 54 (1st Cir. 2011) (arguments "not properly developed before a magistrate judge are deemed waived"); Coons v. Industrial Knife

2.  <u>Moderate Severity for One or More Organs or Body Systems</u>

Plaintiff contends that the ALJ's finding that plaintiff's organs or body systems were not "at least a moderate level of severity," which listing 14.10A.1 requires, ignores the evidence.  (Docket Entry # 16, pp. 11-12).  Plaintiff identifies "his left knee, lungs, and gastrointestinal system" as presenting the requisite "moderate level of severity" and argues that "[h]e obviously has more than two organs/body systems involved."  (Docket Entry # 16, p. 11).  The Commissioner submits the ALJ properly considered all of the evidence and substantial evidence supports the ALJ's determinations.  (Docket Entry # 18, pp. 8, 12-14, 16).  The Commissioner is again correct.

The term "Severe" means "medical severity as used by the medical community."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00C.12.  "Severe" and, by extension, "Severity," "does not have the same meaning as it does . . . in connection with a

---

Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) ("district court was 'free to disregard' the state law argument that was not developed in Coons's brief").  Separately, there is no indication that plaintiff adequately develops an argument vis-à-vis a marked level of limitation "maintaining social functioning" or "completing tasks" under subsections 14.10B.2 and 14.10B.3.  (Docket Entry # 16, p. 12) (explaining why he meets criteria of subsection 14.10B without mentioning these two limitations).

finding at the second step of the sequential evaluation."  20
C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00C.12.

A.  Evaluation of Left Knee

In addressing plaintiff's left knee, the ALJ recognized
that plaintiff reported left knee pain to Dr. Griever on June
14, 2018.  (Tr. 46, 446).  X-rays on June 18, 2014, however,
showed only mild degenerative narrowing, slight narrowing of the
medial compartments, with no sign of a fracture or bone erosion,
as noted by the ALJ.  (Tr. 46, 393).  The ALJ further noted
plaintiff's complaint of left knee pain to Dr. Griever on August
31, 2018, but explained that the recent X-rays showed mild
osteoarthritis, and there was no effusion around the patella on
examination.  (Tr. 47, 507).  "Dr. Griever's impression was
patellar bursitis," and he prescribed an increased dose of
prednisone to calm the inflammation, as accurately recounted by
the ALJ.  (Tr. 47, 507).

The ALJ discussed the three visits in September 2018 with
McNamara, which noted a normal gait and normal range of motion.
(Tr. 47, 488, 494, 500).  He noted plaintiff's report of knee
pain to Dr. Gross on October 17, 2018 as wrapping around
plaintiff's entire knee but stated that on examination the left
knee was cool, had no effusion, and had a normal range of
motion.  (Tr. 48, 439-442).  The ALJ also considered plaintiff's
testimony regarding joint pain, including the testimony of daily

41

pain in his left knee at a level between eight and ten on a ten-
point scale.  (Tr. 43, 75).  The ALJ discounted the statements
as "not entirely consistent with the medical evidence" (Tr. 43),
which include the October 5, 2018 X-rays with similar findings
to the June 2018 X-rays showing mild degenerative narrowing, as
noted by the ALJ.  (Tr. 46, 48, 393, 395).

Plaintiff began a course of physical therapy to address the
left knee pain on November 29, 2018, but only attended seven of
the 12 recommended visits, which the ALJ accurately noted.  (Tr.
48, 1241-61).  Plaintiff was no longer attending physical
therapy at the time of the August 2019 hearing.  (Tr. 43).  The
ALJ recognized that plaintiff presented with a marked gait,
walked with a cane, and exhibited a limited range of motion and
diminished strength on his left side.  (Tr. 48, 1317-18).  The
ALJ further stated, however, that plaintiff was progressing with
repetitions of exercises at the final appointment on January 4,
2019, albeit continuing to complain of pain as a "limiting
factor for functional activity."  (Tr. 48, 1256).  Although he
reported knee pain to Dr. Griever on April 25, 2019, the ALJ
pointed out there was no swelling and a good range of motion on
examination.  (Tr. 49, 1351-52).  A few months later, plaintiff
had a "normal range of motion and strength" in his left knee as
well as "no effusion or fluid collection" during the June 26,
2019 visit with Dr. Gross, as noted by the ALJ and consistent

with the examination findings by Dr. Gross at the October 17, 2018 visit.  (Tr. 48, 49, 442, 1376).

Notably, the ALJ reasoned that plaintiff's prepatellar bursitis of the left knee (Tr. 47) was "fairly well-controlled with prescription medications and physical therapy," he had no hospitalizations since June 2017, and X-rays of the left knee showed only "mild degenerative changes." (Tr. 50).  Together with the examinations by Dr. Gross consistently documenting a normal range of motion and strength, no effusion, and no fluid collection, as stated by the ALJ (Tr. 50), the foregoing provides substantial evidence that plaintiff's left knee did not have the requisite moderate level of medical severity required in subsection 14.10A.1 for 12 consecutive months.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 14.00C.12, 14.10A.1; Myers, 2019 WL 3976017, at *15.

As to physical impairments, including joint pain, the ALJ further explained that plaintiff's daily activities were not "generally consistent" with plaintiff's allegations.  (Tr. 50).  Those activities include preparing meals, shopping for food and clothing, managing finances, and doing "laundry, albeit with some difficulty." (Tr. 50-51).  The ALJ discounted plaintiff's statements about his impairments as more limited than established by the substantial evidence in the record, and he further stated that the medical evidence did not support the

degree of physical limitations plaintiff recounted.   (Tr. 50-51).   The ALJ summarized the evidence at length (Tr. 43-49) and explained the evidence he relied upon to counter plaintiff's statements, some of which consist of plaintiff's statements in his adult function report, his daily activities, and medical examination notes showing a normal range of motion, no synovitis in the left knee, no effusion, normal strength, normal gait, and left knee X-rays showing only mild degenerative narrowing with well-maintained compartments.   (Tr. 50-51).   The ALJ's detailed summary and explanation of reasons to discredit plaintiff's statements regarding his left knee pain based on the entire record provide a proper basis to discount the statements.   See Linhares, 2021 WL 4459701, at *9 (before "ALJ may disregard a claimant's allegations of pain and specific symptoms, the ALJ must articulate 'specific findings as to the relevant evidence he considered in determining to disbelieve'" plaintiff) (bracketed text and citation omitted).   In short, the ALJ recounted the testimony at length and rendered specific findings, which the record supports, that plaintiff's testimony was not entirely consistent with the medical evidence as well as other evidence in the record.   (Tr. 43, 50-51, 393, 395, 442, 446, 448, 491, 496-97, 502, 1351-52, 1376).   Plaintiff's argument that the ALJ ignored the evidence is decidedly misguided.

44

B.  Evaluation of Lungs

Plaintiff also argues that problems with his "lungs (respiratory [system])" as shown by his COPD, pneumonia, and upper respiratory infections, "present at least a moderate level of severity."  (Docket Entry # 16, pp. 11-12).  Plaintiff also cites his testimony of using an inhaler once or twice a day for his COPD and his loss of "breath with exertion."  (Tr. 78-79) (Docket Entry # 16, p. 12).  The Commissioner submits that substantial evidence supports the finding that plaintiff's lungs did not present a moderate level of severity for 12 consecutive months.  (Docket Entry # 18, pp. 1, 12-14).

With respect to COPD and respiratory infections, the ALJ initially noted the June 24, 2017 chest X-ray taken during plaintiff's hospitalization (Tr. 45) showed a small pleural effusion at the base of the right lung with associated airbase disease.  (Tr. 50, 402, 429).  The cited hospital records include a diagnosis of "right lower lobe pneumonia" (Tr. 402, 429) and refer to a past history of COPD.  (Tr. 409, 418). Plaintiff's December 22, 2017 visit to Dr. McIver, however, showed no acute respiratory distress and normal breathing sounds without wheezes or rales on examination, as noted by the ALJ. (Tr. 45, 541).  The ALJ acknowledged and therefore considered the diagnosis of the upper respiratory infection documented during the visit to Dr. McIver as well as during the June 4,

2019 visit to Okechukwu.  (Tr. 45, 46, 541, 1371).  The ALJ
explained, however, that chest X-rays after the June 2017 X-
rays, namely the most recent X-rays taken on June 26, 2019, were
normal.  (Tr. 50, 1383).  Plaintiff denied shortness of breath
to Dr. Gross on February 21, 2018, and reported he was "riding
his bike a lot" to Dr. Gross on June 14, 2018, which the ALJ
noted.  (Tr. 46, 452, 446).  The ALJ also discounted plaintiff's
asserted inability to "walk for too long" on the basis of his
reported range of daily activities, which include shopping for
food and clothing, and doing "his own laundry, albeit with some
difficulty."  (Tr. 50-51, 1375).

The medical evidence includes the pulmonary function
testing.  The most recent testing on July 16, 2019, showed
plaintiff's total lung capacity and diffusion capacity improved
in comparison to the July 2018 testing, as noted by the ALJ.
(Tr. 46, 50, 1385).  The ALJ's findings are supported by
substantial evidence that plaintiff's lungs or respiratory
system did not present "at least a moderate level of severity"
under subsection 14.10A.1.  Here again, plaintiff's argument
that the ALJ ignored the evidence is not well taken.

C.  Gastrointestinal System

Next, plaintiff maintains the ALJ ignored or failed to
consider the evidence that plaintiff's "gastrointestinal system
presents a moderate level of severity."  (Docket Entry # 16, p.

11).  As support, plaintiff cites being "very underweight" and using nutrition supplements to gain weight as evidence of at least a moderate level of severity.  (Docket Entry # 16, p. 12). The Commissioner points out, correctly, that plaintiff's weight increased during the relevant period and substantial evidence supports the finding that "[p]laintiff did not have gastrointestinal issues at a moderate level of severity for twelve consecutive months."  (Docket Entry # 18, p. 14).

Plaintiff's reliance on the May 8, 2017 visit with Dr. Gross (Docket Entry # 16, p. 6), during which she noted her impression of celiac disease and encouraged plaintiff to begin a gluten-free diet (Tr. 464), is misplaced because it is prior to the alleged onset of his disability on June 26, 2017.[9]  Plaintiff also cites his continued weight loss, even though he "was purchasing Ensure, but could not afford it," as reflected in the office notes for the September 28, 2017 visit with Dr. Gross (Tr. 459).[10]  (Docket Entry # 16, p. 6).  The ALJ acknowledges this evidence (Tr. 45) (describing September 28, 2017 visit and that plaintiff "continued to lose weight even while using Ensure"), but accurately notes plaintiff's subsequent weight

---

[9]    The ALJ recognized the evidence regarding the celiac diet by noting Dr. Griever's recommendation for a celiac diet at the August 13, 2018 visit.  (Tr. 47, 517).
[10]    Dr. Gross recorded plaintiff's weight as 127 pounds during this visit.  (Tr. 460).

gain recorded as 132 pounds in August 2018 (Tr. 47, 512) and 153
pounds in April 2019 (Tr. 49, 1352).  The ALJ further identifies
the 15-pound weight gain "in the past three months" (Tr. 49) set
out in the office notes of plaintiff's April 25, 2019 visit to
Dr. Griever (Tr. 1352) ("On physical exam his weight is up 15
pounds over the last 3 months.").  By the time of the August
2019 hearing, the ALJ states that plaintiff weighed 157 pounds
and was six feet, two inches tall.  (Tr. 43, 79).

Plaintiff also relies on his testimony at the August 6,
2019 hearing that he tries to gain weight by drinking three
Ensure drinks each day, at the suggestion of Dr. Gross, and has
only gained "[a] few pounds since" his diagnosis.  (Tr. 79)
(Docket Entry # 16, p. 2).  Plaintiff's testimony is
inconsistent with the 15-pound weight gain as of April 25, 2019.
As more fully explained in Roman numeral I(A), substantial
evidence supports the ALJ's findings regarding a consistent
weight gain.  Further, the ALJ's decision to discount
plaintiff's testimony concerning the persistence of his
symptoms, including involuntary weight loss, because they were
"not entirely consistent with the medical evidence and other
evidence in the record" (Tr. 43) is supported by substantial
evidence, including the evidence of weight gain recited by the
ALJ.  Plaintiff's contention that his "gastrointestinal system
presents a moderate level of severity" meeting the criteria of

48

listing 14.10A.1 (Docket Entry # 16, pp. 11-12), and that the
ALJ ignored the evidence in the record establishing a moderate
level of severity is not convincing.  See generally 20 C.F.R.
Pt. 404, Subpt. P, App. 1, § 14.00C.12 ("*Severe* means medical
severity as used by the medical community.").

Overall, the Commissioner's argument that plaintiff fails
to show evidence of involvement of any organ or body system to
at least a moderate level of severity for 12 consecutive months
is well taken.  See Myers, 2019 WL 3976017, at *15 ("claimant
'must have suffered, or be expected to suffer, all the elements
of a listed impairment continuously for twelve months'").  In
short, plaintiff is mistaken that "his left knee, lungs, and
gastrointestinal system" present the requisite "moderate level
of severity" (Docket Entry # 16, p. 11), and that the ALJ
ignored the evidence that plaintiff met the criteria in
subsection 14.10A.

3.  Marked Limitation in Daily Living Activities

Plaintiff argues that the ALJ ignored the evidence of the
"limitations on [plaintiff's] activities of daily living," which
is one of three means to satisfy the requirement in subsection
14.10B of a "marked level" of functioning.  The Commissioner
submits the "record substantially supports that [p]laintiff did
not have a marked limitation in his activities of daily living"
and fails to show otherwise.  (Docket Entry # 18, pp. 14-15).

The ALJ found that the evidence did "not substantiate . . .
marked limitations in activities of daily living."  (Tr. 40, ln.
1, 4).  Subsection 14.10B requires:

> one of the following at the marked level:
>
>> 1. Limitation of activities of daily living.
>>
>> 2. Limitation in maintaining social functioning.
>>
>> 3. Limitation in completing tasks in a timely manner due
>> to deficiencies in concentration, persistence, or pace.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 14.10.  A regulation
elucidates the phrase "activities of daily living" and the
required "marked" level of limitation for immune system
disorders such as Sjögren's syndrome.  20 C.F.R. Pt. 404, Subpt.
P, App. 1, § 14.00I.6.  In full, it reads as follows:

> Activities of daily living include, but are not limited to,
> such activities as doing household chores, grooming and
> hygiene, using a post office, taking public transportation,
> or paying bills. We will find that you have a "marked"
> limitation of activities of daily living if you have a
> serious limitation in your ability to maintain a household
> or take public transportation because of symptoms, such as
> pain, severe fatigue, anxiety, or difficulty concentrating,
> caused by your immune system disorder (including
> manifestations of the disorder) or its treatment, even if
> you are able to perform some self-care activities.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00I.6; see Phillip v.
Saul, 19 Civ. 5459 (PED), 2020 WL 5096740, at *15-17 (S.D.N.Y.
Aug. 28, 2020).

As previously explained, the ALJ appropriately discounted
plaintiff's testimony that he experiences constant fatigue as

inconsistent with his reported range of daily activities.  (Tr. 50).  As noted by the ALJ and supported in the record, plaintiff's activities include "that he prepares his own meals, shops for food and clothing, manages his finances and does his laundry, albeit with some difficulty."  (Tr. 51, 278, 280-282). He also "watches movies and plays video and card games" every other day and is able to "visit public places unaccompanied, as stated by the ALJ and supported in the record.  (Tr. 43, 51, 76, 278, 280-282).  As to managing his finances, plaintiff is able to pay his bills.  (Tr. 51, 281).  His daily activities also include spending time "on his tablet."  (Tr. 43, 76).

For reasons already articulated, the ALJ appropriately rejected Dr. Griever's circled and unexplained findings, including the circled "[l]imitation of activities of daily living" (Tr. 1306), as "unsupported" and "unclear" regarding what signs and manifestations supported the marked limitation. (Tr. 52).  Overall, substantial evidence supports the ALJ's assessment (Tr. 40) that plaintiff does not have a marked limitation in activities of daily living.  Plaintiff's largely unilluminating contention that the ALJ ignored evidence regarding the limitations of his activities of daily living (Docket Entry # 16, p. 12) is unconvincing.

Plaintiff's additional argument that the ALJ misapplied the law regarding listing 14.10 because he "should have concluded

his analysis at step 3" (Docket Entry # 16, pp. 9-10) is also mistaken.  Because substantial evidence supports the ALJ's conclusion that plaintiff's Sjögren's syndrome impairment did not meet listing 14.10 and was not medically equivalent to a listed impairment, the ALJ did not misapply the law in the manner stated in plaintiff's argument (Docket Entry # 16, pp. 9-10).[11]

B.  ALJ's Sedentary Work Determination

Plaintiff summarily argues the ALJ misapplied the law by determining he "is capable of engaging in work at a 'sedentary' exertional level, even though the uncontroverted evidence does not support this conclusion."  (Docket Entry # 16, p. 9) (citing ALJ's RFC at Tr. 42).  The Commissioner argues that plaintiff waived a challenge to the RFC by failing to develop it.  (Docket Entry # 18, p. 17).

Plaintiff's argument relative to the ALJ's purported erroneous finding that plaintiff had the capability to engage in sedentary work lacks any developed augmentation explaining how the ALJ misapplied the law.  In fact, the supporting memorandum is bereft of any discussion of the ALJ's post step-three determination that plaintiff could "perform sedentary work" (Tr. 42, § 5).  (Docket Entry # 16).  The one-sentence argument that

---

[11]  Plaintiff waives other unstated and undeveloped arguments that the ALJ misapplied the law at step three.

the ALJ misapplied the law by improperly concluding plaintiff

had the capability to engage in work at the sedentary level

(Docket Entry # 16, p. 9) is therefore waived.  See Oliveras v.

Comm'r of Soc. Sec., 354 F. Supp. 3d 94 (finding plaintiff's

objection to ALJ's determination "perfunctory" and therefore

waived) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st

Cir. 1990); accord Zannino, 895 F.2d at 17 (issues adverted to

in "perfunctory manner, unaccompanied by some effort at

developed argumentation, are deemed waived"); see also Curet-

Velázquez, 656 F.3d at 54; Coons, 620 F.3d at 44 (district court

"'free to disregard' the state law argument that was not

developed in Coons's brief").

## CONCLUSION

In accordance with the foregoing discussion, this court

**RECOMMENDS**[12] that plaintiff's motion to reverse and remand to the

SSA (Docket Entry # 15) be **DENIED**, and the Commissioner's motion

to affirm the Commissioner's decision (Docket Entry # 17) be

**ALLOWED**.

                        /s/ Marianne B. Bowler
                        **MARIANNE B. BOWLER**
                        United States Magistrate Judge

---

[12]  Any objection to this Report and Recommendation must be filed
with the Clerk of Court within 14 days of receipt of the Report
and Recommendation to which objection is made and the basis for
such objection.  See Fed. R. Civ. P. 72(b).  Any party may
respond to another party's objections within 14 days after
service of the objections.  Failure to file objections within
the specified time waives the right to appeal the order.